The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner John A. Hedrick, the briefs and oral argument before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission affirms and adopts the Opinion and Award of the deputy commissioner.
 ***********
The admission contained in the Industrial Commission Form 60, Employers Admission of Employees Right to Compensation Pursuant to G.S. 97-18(b) completed by defendant on 30 December 1996 is incorporated herein by reference. In addition, the Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement, at the hearing and by post-hearing agreement as:
 STIPULATIONS
1. Plaintiffs average weekly wage shall be determined by a properly submitted Form 22, Wage Chart.
2. Plaintiff has not worked for defendant since 24 March 1997.
3. Plaintiff has received short term disability and long term disability benefits since March 1997 from a disability plan funded solely by defendant.
4. A set of exhibits, including documentation relating to disability benefits paid by Prudential, plaintiffs employment records, a set of Industrial Commission Forms, the parties discovery responses and a chronologically organized set of plaintiffs medical records, collectively marked as Stipulated Exhibit Number Two, is admitted into evidence.
5. The transcript of plaintiffs pre-hearing deposition, marked as Stipulated Exhibit Number Three, is admitted into evidence.
6. The transcript of Dr. Anne Kathleen Tooheys deposition, marked as Stipulated Exhibit Number Four, is admitted into evidence.
 *********** EVIDENTIARY RULINGS
1. The objections appearing in the depositions of plaintiff, Dr. Winfield, Dr. Toohey and Dr. Baldwin are OVERRULED.
2. A set of plaintiffs medical records from the North Carolina Spine Center, offered into evidence after the hearing, is ADMITTED into evidence.
 ***********
Based upon all of the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing, plaintiff was fifty years old. Plaintiff graduated from high school. Her employment history included work as a waitress, a grocery store cashier, an activities director for a nursing home and work as a secretary/receptionist.
2. Plaintiff began working for defendant through a temporary employment agency in October 1995. She became an employee of defendant in January 1996. Defendant employed plaintiff as a data entry operator. The data entry operator position was a sedentary position. Data entry operators, including plaintiff, worked at desks, typing on keyboards to enter data into defendants computer system. Physically, the duties of this position required plaintiff to reach, handle, finger, feel and see.
3. Defendant employed plaintiff for 47.2857 weeks prior to her injury. During that period, plaintiff earned wages totaling $16,487.63. Calculating plaintiffs average weekly wage by dividing her total wages by the number of weeks and parts thereof during which she earned wages, yields a result that is fair and just to both parties. Thus, plaintiffs average weekly wage was $348.67, which yields a compensation rate of $232.46. Defendant has paid plaintiff temporary disability compensation for an undeterminable period of time between 10 December 1996 and 24 March 1997 based upon its erroneous calculation of plaintiffs average weekly wage.
4. On 10 December 1996, plaintiff only worked for defendant. On that date, plaintiff was riding in a shuttle bus between two of defendants buildings. The shuttle bus seats were positioned so that their backs were against the sides of the bus. While seated in the shuttle bus seat, plaintiffs side was facing the front of the bus. While traveling less than ten miles per hour, the bus came to a sudden stop and caused plaintiff to fall from her seat in a rolling manner. Plaintiff landed, striking her right elbow and right buttock. The bus slowed suddenly again, rolling plaintiff to her left side. Plaintiff continued her workday, but began experiencing pain for which she sought treatment at Durham Regional Hospital on the same day.
5. At the time of her first medical examination, plaintiff was experiencing slight bilateral hip discomfort and some discomfort in both feet. She also had soreness and stiffness in her neck that radiated into both shoulders. Plaintiff was diagnosed as having cervical and lumbar strains and contusions. Thereafter, plaintiff received conservative treatment from Dr. Jacobi, her family physician and Dr. Moon. This conservative treatment included medications and physical therapy.
6. Plaintiff was excused from work from 11 December 1996 through 26 December 1996 at which time she was released to return to work for two hours per day with restrictions against standing for more than five minutes or sitting more than twenty minutes at a time. Plaintiff returned to work in a light duty capacity beginning 30 December 1996. Plaintiffs physicians released her to return to work four hours per day beginning 3 January 1997. On 27 January 1997, plaintiff was released to work five hours per day. The following week she was permitted to work six hours per day, increasing to seven hours per day the following week. Thereafter, plaintiff was released to return to work on a full-time basis beginning 13 March 1997. Dr. Moon provided the foregoing restrictions and releases to return to work.
7. On 20 March 1997, plaintiff was evaluated in the office of her family physician, Dr. Jacobi. Plaintiff sought treatment on that date for a viral illness that had caused her to experience diffuse pains for three days. Due to her symptoms, plaintiff was excused from work until 24 March 1997. Plaintiff returned to work on 24 March 1997. While working on that date, plaintiff began experiencing pain throughout her body. She had difficulty moving her legs and could not ambulate without assistance. As she was leaving work for the day, she began to feel as though her right side was dragging. She was also experiencing pain in her face and jaw. By the time she arrived at her home, she felt as though, and believed that she was becoming paralyzed. Later that evening, she lost her ability to lift her arms and her ability to walk. As a result of these symptoms, plaintiff sought medical treatment in the emergency department of Durham Regional Hospital.
8. Plaintiff informed Dr. Branch, her attending physician, that while working on 24 March 1997 she experienced progressive generalized body pain. Her most significant pain was in her joints, but she also experienced pain in her muscles. Although the etiology of her symptoms was unclear, Dr. Branch most strongly believed that her symptoms were caused by her viral infection. During her admission, plaintiffs symptoms were treated conservatively. During her admission, Dr. Barada reviewed plaintiffs chart and performed a physical examination. Dr. Barada diagnosed plaintiff as having fibromyalgia.
9. In April 1997, plaintiff began receiving treatment from Dr. Toohey, who diagnosed plaintiffs symptoms as being caused by fibromyalgia. Dr. Moon re-evaluated plaintiff on 24 April 1997. Dr. Moon disagreed with Dr. Tooheys opinion that plaintiff had fibromyalgia caused by her injury on 10 December 1997. Dr. Moon suspected that her fibromyalgia was related to the viral illness that led to plaintiffs hospitalization on 24 March 1997.
10. On 6 May 1997, plaintiff underwent nerve conduction studies the results of which were consistent with bilateral carpal tunnel syndrome. Dr. Soo treated plaintiff for this condition. Plaintiff underwent bilateral carpal tunnel release surgery by Dr. Price in July 1997. When evaluated by Dr. Jacobi on 12 May 1997, she expressed concern about her ability to return to work for defendant due to her carpal tunnel syndrome.
11. When evaluated by Dr. Jacobi in July 1997, plaintiff complained of bowel incontinence, memory loss, anxiousness, sleep disturbance, mood swings and a tremor in her upper extremity. On 11 August 1997, plaintiff underwent a MRI study of her brain. The results of the study were negative. Dr. Jacobi re-evaluated plaintiff on 22 September 1997. Dr. Jacobi diagnosed plaintiff as having mechanical low back pain, fibromyalgia, mood disorder/depression and memory loss. Dr. Jacobi determined that plaintiff was unable to perform the requirements of her regular job.
12. After an absence of approximately four months, plaintiff returned to Dr. Toohey in November 1997. During the period between evaluations by Dr. Toohey, plaintiff spent the majority of her time in Rhode Island attending to her mother who was extremely ill. Plaintiff reported that she was sleeping exceptionally well and that she was pain free.
13. On 24 March 1998, Dr. Poplawski evaluated the progressive tremor in plaintiffs right upper extremity. Plaintiff reported that the tremor occasionally extended to her right lower extremity and neck. Dr. Poplawski recommended that plaintiff undergo a brain MRI and an electroencephalogram. During the electroencephalogram, no objective abnormalities were recorded. However, the technician performing the test observed frequent episodes of twitching in plaintiffs right extremities that had no electrographic correlation. Dr. Poplawski tentatively diagnosed plaintiff as having Parkinsons disease. Although he continued to evaluate her condition through June 1999, he never definitively diagnosed her as having Parkinsons. When Dr. Poplawski evaluated plaintiff on 29 June 1999, plaintiff reported that she had been healed during a religious ceremony on Mothers Day. Plaintiff exhibited no evidence of a tremor during the evaluation on that date.
14. Since April 1997, Dr. Toohey has treated plaintiff for fibromyalgia. Dr. Toohey is a rheumatologist. She arrived at the diagnosis of fibromyalgia based upon plaintiffs history, her report of tenderness when pressure was applied to at least twelve sets of trigger points, her sleep patterns and the absence of any other diagnosable condition that would explain her complaints of diffuse body pain. Dr. Toohey determined that plaintiffs fibromyalgia was caused by the incident on 10 December 1996. She made this determination based upon the temporal relationship between the incident and the onset of plaintiffs symptoms. When asked what causes fibromyalgia, Dr. Toohey testified that, "Its entirely speculative as to whether there are triggers or environmental causes. When asked whether plaintiffs fibromyalgia may have been caused by emotional trauma, Dr. Toohey testified that, "Its all speculative. As is the motor vehicle accident. Its all speculative. Moreover, when she determined that plaintiffs fibromyalgia was caused by the incident on 10 December 1996 she did not consider the course of plaintiffs treatment and improvement of her symptoms from 10 December 1996 until 24 March 1997. Likewise, she did not consider that plaintiff had returned to full duty work immediately prior to her March 1997 hospitalization. She did not consider the stress plaintiff experienced due to her mothers chronic illness. However, she also testified that the stress could have caused or contributed to plaintiffs fibromyalgia.
15. Fibromyalgia is a chronic pain syndrome. It is a disorder in which the brain processes pain signals transmitted to it through the spinal cord. It is not a specific disease. Fibromyalgia is a clinical construct. It is a collection of characteristic symptoms that have been given the label fibromyalgia. Women develop fibromyalgia at a rate ten times greater than men. Persons with an unhappy childhood, including persons who are the victims of sexual, physical or emotion abuse, are more prone to develop fibromyalgia. Chronic, unrelieved stress also contributes significantly to the development of fibromyalgia.
16. Considering the lack of scientific and clinical data in this record supporting the presence of a causal relationship between a single injury or event and the development of fibromyalgia, Dr. Tooheys testimony that determining a cause of fibromyalgia is speculative, her failure to consider all relevant facts before determining the cause of plaintiffs fibromyalgia and the relative expertise of Drs. Toohey and Winfield, the Full Commission assigns greater weight to the testimony of Dr. Winfield.
17. When plaintiff began her graduated return to work for defendant in December 1996, defendant filed an Industrial Commission Form 28T, Notice of Termination of Compensation by Reason of Trial Return to Work Pursuant to G.S. 97-18.1(b) and G.S. 97-32.1. As of 24 March 1997, plaintiff had been released to return to work without restrictions. Thereafter, plaintiff did not file an Industrial Commission Form 28U, Employees Request that Compensation be Reinstated After Unsuccessful Trial Return to Work Pursuant to G.S. 97-32.1.
18. Plaintiff has not worked for any employer since 24 March 1997. Plaintiff has not sought employment from any employer since 24 March 1997. During the period since plaintiff last worked, she has received short and long term disability benefits at the rate of $888.00 per month. On 1 May 1999, this amount was reduced when plaintiff began receiving social security disability benefits.
19. Dr. Thomas S. Baldwin evaluated plaintiff on 24 September 1999. Dr. Baldwin determined that plaintiff is not a candidate for employment in any job within the national economy. Dr. Baldwin is a licensed psychologist. He is not a physician. In arriving at this conclusion, Dr. Baldwin performed no labor market survey and no fieldwork. Dr. Baldwin knew nothing about plaintiffs physical abilities other than what she reported to him. However, Dr. Baldwin believed that physicians have a restrictive view of their patients ability to return to work because they do not want to admit that they are unable to correct a physical problem. Dr. Baldwin did not know what physical restrictions plaintiffs treating physicians might have imposed. Dr. Baldwin reached the conclusion that plaintiff was not a candidate for any job in the national economy based upon plaintiffs report of her physical abilities. Considering Dr. Baldwins education and experience and the inexactness of his vocational evaluation, the Full Commission assigns no weight to Dr. Baldwins testimony.
20. Since 24 March 1997, no physician has excused plaintiff from work or restricted her physical activities due to any injury or condition related to her injury on 10 December 1996.
21. On 24 March 1997, the date plaintiff was released to return to regular work without restrictions, she regained the capacity to earn wages equal to or greater than the wages she earned on 10 December 1996. Plaintiffs failure to earn wages after that date was not due to the incident on 10 December 1996.
22. The evidence of record is insufficient to prove by its greater weight that plaintiff sustained any permanent impairment as a result of the incident on 10 December 1996.
 ***********
The foregoing findings of fact and conclusions of law engender the following additional:
 CONCLUSIONS OF LAW
1. As a result of her injury on 10 December 1996, plaintiff is entitled to payment of temporary disability compensation for all periods of total and partial disability between 10 December 1996 and 24 March 1997 based upon her correct average weekly wage, $348.67. G.S. 97-19(b); G.S. 97-29; G.S. 97-30.
2. On 24 March 1997, plaintiff was released to return to regular work without restrictions and was not thereafter rendered incapable of earning wages as a result of her 10 December 1996 injury. Therefore, plaintiff is entitled to no temporary disability compensation after 24 March 1997. G.S. 97-18.1; G.S. 97-32.1; Harrington v. Adams-Robinson, 349 N.C. 218,504 S.E.2d 786 (1998).
3. Plaintiff is entitled to no permanent partial disability compensation as a result of her injury on 10 December 1996. G.S. 97-31.
4. Plaintiff is entitled to no medical compensation for treatment of fibromyalgia. G.S. 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Defendant shall pay plaintiff temporary disability compensation at the correct compensation rate for all periods of temporary disability previously paid by defendant.
2. Plaintiffs claim for disability compensation after 24 March 1997 and medical compensation for treatment of fibromyalgia must be, and the same is hereby, DENIED.
3. Each party shall bear its own costs, except that defendant shall pay expert witness fees of $450.00 to Drs. Toohey and Winfield.
This 5th day of February 2001.
 S/____________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/_____________________ LAURA K. MAVRETIC COMMISSIONER
 S/_____________________ CHRISTOPHER SCOTT COMMISSIONER